UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------------x
                                             :
HYPOXICO, INC.,                              :
                                             :
                            Plaintiff,       :        02 Civ. 6191 (TPG)
                                             :
              – against –                    :        **OPINION**
                                             :
COLORADO ALTITUDE TRAINING LLC,              :
                                             :
                            Defendant.       :
                                             :
---------------------------------------------x
```

Plaintiff Hypoxico, Inc. ("Hypoxico") sues defendant Colorado Altitude Training LLC ("CAT") for infringement of patents owned by Hypoxico. The case was brought on for jury trial beginning Monday, January 30, 2012. After a two-week trial, the jury returned a verdict in favor of plaintiff, finding that CAT had infringed Hypoxico's patents and was liable in the amount of $1 million.

CAT now moves for judgment as a matter of law on the issues of infringement, or, in the alternative, moves for remittitur or a new trial pursuant to Federal Rule of Civil Procedure 59. Hypoxico moves for a permanent injunction, an accounting for uncompensated infringing sales, and pre- and post-judgment interest.

The court grants CAT's motion for judgment as a matter of law, holding that CAT's 315, 430, and 535 tent systems do not infringe the 222 patent. The court grants CAT's motion for judgment as a matter of law on the issue of infringement of the 652 patent. The court denies CAT's alternative motion for a

new trial should the Federal Circuit vacate or reverse the amended judgment.

The court denies CAT's motion for remittitur.  The court denies Hypoxico's motion for an accounting.  The court denies Hypoxico's motion for pre- and post-judgment interest.

The court denies Hypoxico's motion for a permanent injunction.

## Evidence

As noted above, the court held a trial in this case beginning on January 30, 2012.  This was the second trial in a long-running patent infringement litigation between two companies that manufacture altitude-simulation systems.  After the previous trial, which took place in January 2009, the court overturned the jury's verdict for plaintiff.  The court also reversed the first jury's damages verdict of $4,325,000, holding that Hypoxico's expert damages testimony in that trial was deeply flawed and could not credibly support a claim for lost profits.  Accordingly, the court granted a new trial as to both liability and damages.

At issue in the second trial are two patents held by Hypoxico:  United States Patent No. 5,964,222, entitled "Hypoxic Tent System," (the "222 patent"), and United States Patent No. 5,799,652, entitled "Hypoxic Room System and Equipment for Hypoxic Training and Therapy at Standard Atmospheric Pressure," (the "652 patent").  Both patents protect systems for creating an oxygen-depleted ("hypoxic") environment.

Spending time in a hypoxic environment causes the human body to undergo a series of physiological changes in response to the reduced amount of

available oxygen.  In particular, the body produces more red blood cells and increases the amount of oxygen-carrying hemoglobin in the blood.  Because the body retains these adaptations for some time after returning to low altitude, it is believed that athletes who spend time at altitude can gain a competitive advantage when competing at sea level.  Simulating high altitudes allows athletes to experience these changes and advantages without actually leaving sea level.

CAT's Products

CAT makes a variety of altitude simulation systems.  Each system features an enclosure, and a gas-separation device that introduces hypoxic air into the enclosure.  CAT's "uncontrolled" tent systems are the only products at issue for the present motions.[1]  CAT's tent systems are fabric or plastic tents constructed around a supporting structure to create an enclosure large enough for a person to sleep in.  Four types of tent systems are currently at issue:  the 150, 315, 430, and 535.  Hypoxico alleges that each of the four tent systems infringed both of the patents in suit.

The 222 Patent Issues

As will be shown in more detail when the 222 patent is described, the essential issue for trial was whether the CAT products infringed the elements of

---

[1] Some of CAT's tent systems include "controllers," which are devices that monitor and regulate the air in the enclosure.  CAT refers to the systems that use controllers as "controlled systems."  During the trial, the court held that CAT's controlled systems do not infringe Hypoxico's patents.  Therefore, the jury did not consider the question of infringement with respect to CAT's controlled systems.

that patent dealing with portability.

The CAT 150 tent, also called the "Mailbox Tent," was CAT's smallest tent product and was advertised on CAT's website as being portable.  PTX 193 at 9.[2] At trial, CAT did not contest that the 150 tent infringes the 222 patent.  2/7 Trial Tr. 1034:16-22.  However, CAT no longer sells the 150 tent.  CAT's president, Lawrence Kutt, testified that CAT obtained legal advice prior to introducing the 150 tent and that CAT's counsel at that time advised that the product did not infringe the patents in suit.  CAT subsequently employed a different attorney who offered a different opinion.  Upon receiving the opinion from counsel that the 150 tent infringed the 222 patent, CAT removed the product from the market.  2/7 Trial Tr. 971:20-975:1.

Under these circumstances, the trial did not involve any issue about liability with respect to the 150 tent in connection with the 222 patent. However, the issue of damages remained as to the 150 tent.

The CAT 315, 430, and 535 tent systems are larger systems, in the form of a room large enough to hold a bed.  The systems have four walls, a floor, and a ceiling, made of heavy transparent plastic.  They are supported by poles at the vertical and horizontal edges.  The systems have a zippered door on one side through which the user enters and exits.  They are listed in CAT's marketing materials as "walk-in" tents.  PTX 193 at 3, 5.  They are not described as being portable.  See id.

---

[2] PTX 193 consists of product descriptions printed from CAT's website.  The printouts are dated Jan. 12, 2009.

It is important to note that each tent consists of a single large "piece" of plastic, which is shaped to create the walls, the floor, and the ceiling.  There are not separate smaller pieces making up the walls, etc.

The 315 tent is 7′ x 7.5′ x 6′.  Id.  The 7.5-foot dimension is the width, the 7-foot dimension is the depth, and the 6-foot dimension is the height.  The tent fits over a Queen-sized bed.  The marketing materials show a Queen-sized bed inside the 315 tent, plus two small bedside tables, one on either side of the bed, with lamps.  Id.  As far as the weight of the system, the tent itself weighs 24 pounds, the poles weigh 35 pounds, and the air unit weighs 70 pounds.  1/30 Trial Tr. 32:7-10.  Therefore the total weight for the 315 system is 129 pounds.  Id.  There are poles equal in length to the dimensions described above.  They attach at joints, but the poles in the 315 tent do not come apart to reduce their size.

CAT's 315 tent system was set up in the lobby outside of the courtroom during the trial.

The 430 tent is 7′6″ x 9′6″ x 6′.  PTX 193 at 5.  The 9.5-foot dimension is the width, the 7.5-foot dimension is the depth, and the 6-foot dimension is the height.  The tent fits over a King-sized bed.  Id.  The marketing materials for the 430 tent show the tent with the King-sized bed, plus bedside tables and lamps.  Id.  The tent for the 430 system weighs 25 pounds, the poles weigh 40 pounds, and the air unit weighs 70 pounds.  1/30 Trial Tr. 32:7-10.  The total weight of the 430 system is 135 pounds.  The wall with the 9.5-foot dimension is in sections, so that there is no pole 9.5 feet long.  However, the poles on the

7.5-foot wall are of that length.

The 535 tent, although not included in the marketing materials, is larger than the 430 tent.  The 535 system is custom-built for those customers who require a larger system.  The tent and poles for the 535 system weigh at least as much as those of the 430 system, and possibly more depending on the size.  The longest poles for the 535 system are at least as long as those for the 430 system, and possibly longer.  Id.

The 222 Patent

At trial, Hypoxico argued that CAT's 315, 430, and 535 tent systems infringe claim 3 of the 222 patent.  It was agreed that the issues to be tried under the 222 patent would be limited to whether CAT's systems were portable and had a collapsible supporting structure within the meaning of the patent.

Claim 3 of the 222 patent incorporates claim 1.  The relevant claims read as follows:

> 1. A system for providing a reduced-oxygen atmosphere for breathing to a user at rest, said system comprising:
> an oxygen-extraction device having an inlet taking in ambient air and an outlet for transmitting oxygen-depleted air;
> *a portable tent* having internal space therein and an entry communicating with said internal space and through which the user can enter said internal space; said tent having *collapsible supporting structure*;
> said outlet communicating with said internal space and transmitting said oxygen-depleted air to said internal space;
> said internal space communicating with an external environment through naturally existing gaps and fabric pores, allowing excess air to escape said internal space and equalizing atmospheric pressure inside said tent to the outside parameter.
>
> . . . .
>
> 3. The system according to claim 1 and said hypoxic tent made of

> soft synthetic or natural material and supported by supporting
> structure, which is *inflatable or assembled from segments* made
> from metal, plastic or composite material.

(Emphases added.)  Diagrams in the 222 patent show a dome-like tent

structure that can be stretched over a bed or mattress.

The patent specification states that the "invention makes it possible to

make a portable version of the Hypoxic Room System, convenient for athletes

while traveling, and may be easily installed at home or in any hotel room."  222

Patent, col.1 ll.37-40.  It goes on to state that the "system can be easily

disassembled and packed in luggage."  Id. at col.2 ll.50-51.

During the trial, the court provided the jury with handouts entitled

"Claim Construction," which the court also read to the jury.  The court's claim

construction for the 222 patent was as follows:

> With regard to claim 3 of the 222 patent, the patent describes a
> portable tent having a collapsible supporting structure, which is
> inflatable or assembled from segments made from various
> materials.  But the tent, according to the patent, must be portable.
> For claim construction, the court refers to the specification in the
> 222 patent, which states
>
> > The invention presented here provides a convenient, low cost
> > solution to create such an environment for sleeping.  This
> > invention makes it possible to make a portable version of the
> > Hypoxic Room System, convenient for athletes while traveling,
> > and may be easily installed at home or in any hotel room.

> The court also refers to the further language in the specification:
>
> > Hypoxic tent system can be easily disassembled and packed
> > in luggage.

2/10 Trial Tr. 1508:24-1511:5.  During the trial, the court rejected Hypoxico's

suggestion that portability meant "easily transported or moved."  The court

stated that

> [e]asily transported or moved could be easily transported or moved by a truck.  Now that is not what is meant in my view in the 222 patent.  My dining room table can be easily moved if I get enough workmen and a truck but that's not what is talked about.

2/2 Trial Tr. 560:24-561:3.  The court also refused to read to the jury Hypoxico's proposed construction that portability meant "easily transported or moved," stating, "I don't agree with this.  I don't think it's sufficient, so I won't read it and I will not rely on it.  It is my job to instruct the jury and to make claim construction, and that is not a sufficient definition."  2/2 Trial Tr. 560:8-11.  The court also stated that if "it's portable in the sense that somebody can carry it, well then, it's portable, or check-in on a plane it's portable.  If it requires movers and a truck, it isn't."  2/3 Trial Tr. 696:25-697:2.

As the later discussion of the law will show, where an attorney argues claim construction to a jury and that argument is contrary to the court's claim construction, a jury verdict may be properly overturned.  Medtronic Navigation, Inc. v. Brainlab Medizinische Computersystems GmbH, 417 F.Supp. 2d 1188, 1201 (D. Colo. 2006), aff'd 222 Fed. App'x 952, 954 (Fed Cir. 2007).  This is what occurred in the present case.  Plaintiff's attorney in summation did not essentially base his argument on the actual language of the patent and specification and on the court's construction, but presented to the jury the argument which he had proposed to the court, and which the court had rejected.  Here is the relevant language from the summation of Hypoxico's attorney:

> Being portable doesn't mean you have to take it with you

when you go to the supermarket.  Doesn't mean you have to take it with you when you are going to grandma's house for the weekend. Being portable means that it's capable of being moved.  You could set up a portable tent and never move it.  I've got a stapler on my desk.  It's portable.  It stays on my desk.  I don't take it anywhere. Is it less portable because I don't pick it up and put it in my pocket?  No.  The question is, can that structure be taken down, reassembled, and set up some place else?  This structure hasn't been here for three years since the last time we had court proceedings.  It was brought here, set up, taken down, brought out some place else, set down, brought out to the attorney's office, set up, brought down, brought over here, and I am pretty sure they are going to take it down and take it with them.

Portable. I don't know how much more you can say about portable.

2/10 Trial Tr. 1544:9-25.  Thus, the attorney argued to the jury that, "being portable means that it's capable of being moved."  This, and the rest of the argument, failed to take into account the crucial language of the specification that portable means being "convenient for athletes while traveling" and capable of being "easily installed at home or in any hotel room," and finally that portability involved being "easily disassembled and packed in luggage."

Ruling on the 222 Patent Issues

When the evidence is carefully analyzed, it becomes clear beyond any question that Hypoxico made out no case of portability against any of the three CAT tent systems at issue during the trial—315, 430, and 535.  The court means exactly this—no case.

On the issue of whether these tents were collapsible, they clearly could be taken apart and were thus collapsible.  But there could be no infringement unless the tents were also portable within the meaning of the patent.  And it was the issue of portability that was dealt with at the trial.

The court will set forth the relevant law later in this opinion.  But the court desires to promptly state its view as to how that law applies to the evidence in this case.

The rooms involved in the three tent systems have just been described, together with their dimensions and weights.  Although they were made of poles and plastic, rather than masonry, they are still rooms of substantial size and substance.  They are not a mere covering to be dropped over a bed, as in the case of the 150 tent, which CAT has now honestly conceded infringes the 222 patent.

Hypoxico had the burden of proof at trial to show infringement—i.e., portability within the meaning of the patent.  But Hypoxico took no real step to make out a case.  The smallest of the three rooms at issue—the 315 tent—was set up in the lobby of the courtroom during the trial.  If that tent was portable within the meaning of the patent, Hypoxico had full opportunity to demonstrate this.  Hypoxico could have arranged to have the tent disassembled and packed up in some way to show its portability, if it was portable within the meaning of the patent.  All this could have been carried out for observation by the jury, as an actual demonstration (not theorizing) of the portability of the tent.

It should be remembered that a tent in the 315, 430, and 535 series consists of a single large piece of plastic, which is shaped to create the walls, the floor, and the ceiling.  The bed can only be brought into the tent or taken out of the tent by being disassembled so that sections can be taken through the door of the tent.  Thus to take the tent down would mean disassembling a

bed, and to put the tent back up would mean disassembling a bed in the new location, moving the bed parts into the tent, and reassembling the bed.  2/7 Trial Tr. 971:8-13.  All this distinguishes the 315, 430, and 535 tents from the truly portable 150 tent, which can simply be dropped over a bed.

During the trial, the disassembled components of the 430 tent were in some kind of a case, presumably a case for the delivery of such components. All this was lying on a table within the view of the jury.  Hypoxico made no real use of this to demonstrate actual packing and carrying in the way that the patent describes.  Again, plaintiff was not willing to attempt any actual demonstration of portability.

There was another fundamental failure on the part of Hypoxico in providing evidence of portability.  The marketing of one or more of the tents in question went back to about 2002.  Presumably, if one or all three of these tents were portable, CAT would be informed of portable usage through information of one kind or another from its customers.  Hypoxico could have obtained this information in discovery, and if anything emerged favorable to Hypoxico's case, that surely would have been introduced into evidence.  But Hypoxico introduced no evidence whatever of any general or substantial portable usage of the tents in question.

The actual evidence is directly to the contrary.  Hypoxico did introduce two advertisements from 2002 for one of CAT's tent systems.  The ads claimed "portability with easy setup."  PTX 625, PTX 626, 2/8 Trial Tr. 1081:10-1082:21.  Kutt testified that CAT later discontinued these ads due to "customer

pushback" in response to the portability claim; he stated that customers "bought the tent and came back and essentially said this ain't our idea of portability."  2/8 Trial Tr. 1082:24-1083:2.  Hypoxico introduced an article stating that Anthony Gonzalez, an Ohio State University football player, had his CAT tent brought from one state to another for a game.  The tent was installed in his hotel room.  PTX 620, 2/8 Trial Tr. 1081:4-8.  But this was <u>one</u> instance.  Moreover, there is no evidence of actually how the football player managed the move.

There is no doubt that the three tents in question can be disassembled and moved to another location.  Hypoxico introduced a CAT user guide that contained a list of "Frequently Asked Questions," including a question asking— if the user wishes to take his tent down and move it to a different location, is there anything he should know.  The answer focused on disassembling the poles, which are waxed at the factory to assist, but which can still present difficulties in the disassembling process.  PTX 9, 2/8 Trial Tr. 1093:23-1096:2.  The mere fact that the tents can be disassembled and moved does not, of course, mean in any way that they are portable <u>within the meaning of the patent</u>.

At least at one time, CAT sold traveling cases for the air generators.  PTX 510, 511, 2/8 Trial Tr. 1090:1-1093:18.  The record is not completely clear as to whether CAT still does.  But in any event, such sales, whenever they have occurred, provide no real evidence regarding the portability of the <u>entire system</u>.  It could be natural to sell a traveling case for the generator, because

- 12 -

the generator has the potential of being used with different products of CAT.

Hypoxico questioned Kutt regarding airline standards for checked baggage, pointing out that airlines allow passengers to check sports equipment such as pole vaults or skis that are comparable in size to the poles for the CAT tent systems.  PTX 622, 2/8 Trial Tr. 1071:3-1077:23.  Of course, all this does is to suggest a theoretical relationship between certain kinds of sporting equipment and the large tents produced by CAT.  Of course, the tents are different from skis and pole vaults.  In any event, this theory is surely no substitute for the kind of actual demonstration and actual real-life experience, which Hypoxico failed to prove.

The court concludes that there is no evidence of consequence to show that the 315, 430, and 535 tents, or any one of them, are portable within the meaning of the 222 patent.  There was no reasonable basis for a jury verdict to the contrary.  The court therefore grants judgment as a matter of law to the effect that CAT's 315, 430, and 535 tents do not infringe the 222 patent.

The 652 Patent Issues

At trial, Hypoxico argued that CAT's tent systems containing zippers infringe claims 5 and 19 of the 652 patent.  The issue for trial with respect to the 652 patent was whether the zippers in the tents were vents or apertures within the meaning of the patent.

The 652 Patent

Claim 5 of the patent incorporates claims 1 and 4.  Claim 19 incorporates claim 11.  The relevant claims of the 652 patent read as follows.

The term "vents" first appears in claim 4, and the term "apertures" in claim 5.

1. A system for use in an external atmospheric environment of air at an external ambient air pressure and having an ambient oxygen concentration for providing a reduced-oxygen atmosphere to a user, said system comprising:

a gas separation device having an inlet intaking an intake gas mixture and first and second outlets, said first outlet transmitting a first gas mixture derived from said intake gas mixture and having a higher oxygen content than the intake gas mixture and said second outlet transmitting a second gas mixture derived from said intake gas mixture and having a lower oxygen content than the intake gas mixture;

a breathing chamber having an internal space therein containing air and including an entry communicating with said internal space and through which the user can enter said internal space;

said second outlet communicating with said internal space and transmitting said second mixture to said internal space so that said second mixture mixes with the air in the internal space;

said first outlet transmitting said first gas mixture to the external atmospheric environment; and

said breathing chamber permitting the communication of air in at least one direction between the external atmospheric environment and the internal space and in combination with the gas separation device, maintaining the air in the internal space at a pressure generally equalized with the ambient air pressure of the external atmospheric environment and at a substantially constant concentration of oxygen substantially lower than said external ambient oxygen concentration.

. . . .

4. The invention according to claim 1 and

said breathing chamber having *vents* therein, said vents providing for flow of air between said external atmospheric environment and said internal space.

. . . .

5. The invention according to claim 4 and

said *vents having apertures* therein through which air can flow in either direction between said internal space and said external atmospheric environment.

. . . .

- 14 -

11. A system for use in an external atmospheric environment of air at an external ambient air pressure for providing a low-oxygen environment for a user, said system comprising:

a chamber comprising a door and wall structure defining a closed space into which the user can enter through the door;

a gas processing device having an intake and first and second outlets, said device intaking a gas mixture through said intake and emitting a reduced oxygen gas mixture having a lower concentration of oxygen than said gas mixture through said first outlet and emitting an enriched-oxygen gas mixture having a greater concentration of oxygen than said gas mixture through said second outlet;

said first outlet being connected with said chamber so that the reduced-oxygen gas mixture is emitted into said closed space inside the chamber and mixes with the air therein;

said chamber having *apertures* therein allowing communication therethrough of air in the outside environment with air in the chamber, said chamber and said gas processing device maintaining the air in the closed space at a pressure substantially equal to the external ambient air pressure and at a substantially constant oxygen concentration lower than the air outside the chamber;

said gas processing device comprising a separation unit to which the intake gas mixture from the inlet is transmitted, said separation unit separating the intake gas mixture into a reduced oxygen gas mixture with an oxygen concentration lower than said intake gas mixture and an enriched oxygen gas mixture with an oxygen concentration higher than said intake gas mixture, said separation unit having a reduced oxygen mixture conduit through which said reduced oxygen gas mixture is transmitted and an enriched oxygen mixture conduit through which said enriched oxygen gas mixture is transmitted;

said first outlet being operatively associated with said reduced oxygen mixture conduit and receiving said reduced oxygen gas mixture therefrom, said second outlet being operatively associated with said enriched oxygen mixture conduit and receiving said enriched oxygen gas mixture therefrom and releasing said enriched oxygen gas mixture to the external atmospheric environment.

. . . .

19. The invention according to claim 11 and
said *apertures* providing openings in said wall structure.

- 15 -

(Emphases added.)

The court provided the jury with handouts presenting the court's claim construction and also read the claim construction to the jury. The construction relating to claims 5 and 19 of the 652 patent was as follows:

> Zippers in the walls of a tent may be "vents having apertures" within the meaning of claim 5 of the 652 patent and may be "apertures providing openings in the wall structure" within the meaning of claim 19 of the 652 patent. . . . Although, as stated, such zippers may be vents and/or apertures, they are actually covered by these terms as used in claim 5 and claim 11, only if they perform certain functions and avoid certain functions or results. They must assist in the carrying out of the basic function described for the patented device or devices as a whole—that is, the maintaining of the air in the internal space or the closed space at a substantially constant concentration of oxygen substantially lower than the outside air. However, a zipper can be a vent and/or aperture within the meaning of the patent if it also provides general ventilation.

> But, in order to come within the meaning of the patent, the zippers and the operation of the zippers must not detract from the basic function of maintaining a substantially constant concentration of oxygen. Claims 5 and 19 with their references to vents and/or apertures do not amend the basic requirement of maintaining a substantially constant concentration of oxygen nor do the references to such vents and such apertures indicate that the requirement of such maintenance is detracted from or reduced. Thus, if zippers are covered by the references to vents and/or apertures in claims 5 and 19, they cannot be susceptible of operation in a way that interferes with the basic requirement of maintaining a constant concentration of oxygen in the chamber.

The concept of claim 1 is that the air in the breathing chamber would come from two sources. The first would be the "external atmospheric environment." This would be "in combination with" the air from the gas separation device with its reduced concentration of oxygen. Claim 1 provides for the "communication of air in at least one direction between the external

- 16 -

atmospheric environment and the internal space." This provides for the appropriate air pressure and oxygen concentration.

Claim 4 introduces the concept of "vents," obviously to carry out the requirements of claim 1 regarding the external environment. Claim 4 describes the vents as "providing for the flow of air between said external atmospheric environment and said internal space." Claim 5, which is at issue in the present case, provides that the vents referred to in claim 4 would have "apertures . . . through which air can flow in either direction between said internal space and said external atmospheric environment."

Claim 11 provides that the chamber would have "apertures," which would allow communication of air from the "outside environment" to air in the chamber. This portion of claim 11 goes on to state that this process would maintain the air in the closed space at a pressure equal to the outside air pressure and "at a substantially constant oxygen concentration" lower than the outside air. Claim 19 simply added that the apertures would be "openings in the wall structure."

Obviously the vents and apertures referred to in the above claims are provided for in the patent for a very specific purpose. That purpose, of course, is to have a chamber with air containing a reduced concentration of oxygen and to have the air pressure in the chamber essentially equal to the pressure of the outside air.

Again, the provision for vents and apertures in the patent is not something stated in the abstract, but the vents and apertures are provided for

as the stated means for carrying out the defined purposes of the patent.

Ruling on the 652 Patent Issues

As noted above, CAT's 315 tent system was set up outside of the courtroom during the trial.  The tent has zippers to allow opening and closing of the door, and these zippers are not at issue.  The tent also has certain zippers in the walls, and it is these zippers which are at issue in the present case.

During the trial, the 315 tent was "operated."  There was an air unit outside the tent, which fed air with the reduced oxygen content into the tent. There was a monitor so that the level of oxygen in the tent could be observed according to certain criteria.  This operation was carried out exactly as desired.  Also, there was never any suggestion, or indication, that the air pressure inside the tent was different from the outside air pressure in any problematic way. There was, at times, a slight bowing out of the walls, but no one bothered to even take any measurements of what this involved.

At all times during this operation, except for a few instances where the operation of the zippers was illustrated, the zippers were closed.  The zippers were never opened to act as vents or apertures within the meaning of the patent.

Obviously, the tent was not airtight.  Some amount of air was introduced from the air unit.  And, as occurs in even more solidly built structures, air leaks out in various ways.  But, as stated, the zippers were closed and did not in any way operate as vents or apertures during the entire time of the operation

of the tent for the trial.

The opening necessary to let air <u>from the air unit</u> enter the chamber is, of course, not a vent or an aperture within the meaning of the patent.  Also, a closed zipper is surely not a vent or aperture within the meaning of the patent.  This means that the 315 tent operated during the entire trial in a manner that carried out the hypoxic function for which it was designed, and this operation occurred without vents or apertures.  Thus this operation did not infringe the 652 patent.

There is no suggestion that the situation would be different for the 430 tent or the 535 tent.

There was evidence about the purpose for installing the zippers.  CAT has a user guide, which suggests that the zippers can be opened somewhat, to provide for fresh air and to remedy temperature problems.  But this is suggested mainly for "the first few nights" when the body is reacting to the new environment.  PTX 9, 2/8 Trial Tr. 1127:19-1129:9.  However, this could create the problem of interfering with the "altitude," and if such a problem is occurring, the zippers "should be closed."  PTX 9, 2/8 Trial Tr. 1152:2-1153:4. Plaintiff's own expert testified that, although the opening of zippers could allow fresh air into the tent, the more the zippers are opened, it would be difficult to maintain the necessary constant reduced oxygen concentration.  2/2 Trial Tr. 594:16-22; 2/3 Trial Tr. 554:14-17.

The only evidence about actual usage, rather than theory, came from Kutt and from Shaun Wallace, a CAT employee.  Kutt testified that opening of

the zippers was for temporary use during the first nights, but that CAT discovered that such usage really did not work and that it caused the oxygen concentration to vary too much.  2/8 Trial Tr. 1128:25-1129:9; 1153:3-4. Wallace testified that the zippers were part of CAT's attempt to solve temperature problems, but this turned out to be problematic in that CAT found that if the zippers were opened enough to make any difference, outside air was getting in and altitude could not be maintained.  According to Wallace, the "primary way of using the tent, the way it was designed, was to be used with the zippers closed." 2/8 Trial Tr. 1211:13-1212:20.

Hypoxico introduced no evidence to the contrary.

The zippers in the CAT tents are very far from being the vents and apertures described in the patent.  Such vents and apertures, as described in the patents, are mechanisms which are part of the functioning of the overall device.  The patent is a long distance from setting forth something which is generally <u>closed</u>, but which may be opened a little, or more than a little, for a few moments, or longer, depending on the desire of the human being who is using the device, to obtain some temporary relief from heat or for some similar reason.

Also, it is clear from the evidence introduced on both sides that the opening of the zippers can be detrimental to the purpose of the device regarding reduced oxygen concentration.  Essentially, the evidence on both sides was in agreement about the nature of the zippers, and could lead to only one conclusion, and that is that the zippers are not the vents and apertures

- 20 -

described in the patent.

There was no reasonable basis for a jury verdict to the contrary.  The
court therefore grants judgment as a matter of law to the effect that CAT's 315,
430, and 535 tents do not infringe the 652 patent.

The Law

The law regarding judgment as a matter of law following a jury verdict is
well-known.  The court has already made its rulings, as described above, based
on the state of the evidence.  However, this opinion should include a short
summary of the law, which follows.

A court may set aside a jury's verdict and enter judgment as a matter of
law if "a party has been fully heard on an issue during a jury trial and the
court finds that a reasonable jury would not have a legally sufficient
evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).
Judgment as a matter of law is properly granted "only when, drawing all
reasonable inferences regarding the weight of the evidence and the credibility of
witnesses in favor of the non-movant, a reasonable jury could only have found
for the movant."  Highland Capital Mgmt. LP v. Schneider, 607 F.3d 322, 326
(2d Cir. 2010).  The standard requires "such a complete absence of evidence
supporting the verdict that the jury's findings could only have been the result
of sheer surmise and conjecture, or such an overwhelming amount of evidence
in favor of the movant that reasonable and fair minded men could not arrive at
a verdict against" the moving party.  U.S. v. Landau, 155 F.3d 93, 100 (2d Cir.
1998).

A jury is "entitled to believe parts and disbelieve parts of the testimony of any given witness." Fiacco v. City of Rensselaer, N.Y., 783 F.2d 319, 325 (2d Cir. 1986). Assessing credibility, weighing evidence, and drawing logical inferences from facts are the province of the jury, not of the court. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000). Attorney argument cannot be substituted for evidence. Enzo Biochem, Inc. v. Gen-Probe, Inc., 424 F.3d 1276, 1284 (Fed. Cir. 2005); Cacace v. Meyer Mktg. (Macau Commercial Offshore) Co., Ltd., 812 F.Supp. 2d 547, 560 (S.D.N.Y. 2011).

Furthermore, where a party repeatedly ignores the court's claim construction in a patent case and continues to argue claim construction issues to the jury, the jury's verdict may be properly overturned. See Medtronic Navigation, 417 F.Supp. 2d at 1201 (overturning jury verdict for plaintiff where plaintiff's attorney and witnesses repeatedly argued plaintiff's own claim construction to the jury, which contravened the construction given by the court).

The court believes that CAT is entitled to judgment as a matter of law with respect to the infringement claims on the 315, 430, and 535 tents, and that this ruling is amply justified on the basis of the state of the evidence and the legal principles here described.

Motion for a New Trial

CAT also moves, in the alternative, for a new trial on the issue of infringement under Fed. R. Civ. P. 59(a). Where a court

> grants a renewed motion for judgment as a matter of law, it must
> also conditionally rule on any motion for a new trial by determining
> whether a new trial should be granted if the judgment is later
> vacated or reversed.  The court must state the grounds for
> conditionally granting or denying the motion for a new trial.

Fed R. Civ. P. 50(c)(1).

As stated in this opinion, the court strongly disagrees with the jury's verdict on infringement and believes that it should be overturned as a matter of law.  However, the court also believes that this litigation should come to an end.  In the event the Court of Appeals affirms, this would lead, in the court's view, to a proper conclusion.  However, if the Court of Appeals should reverse, the appropriate result is that the jury's verdict stands.  It would not be proper administration of justice to test out the issues again in a third trial.

Therefore, the motion to conditionally grant another trial is denied.

Motion for a Permanent Injunction

Hypoxico moves for a permanent injunction pursuant to 35 U.S.C. § 283 enjoining CAT, and all those acting in concert or participation with it who receive notice of the injunction, from making, using, selling, offering for sale, or importing into the United States controlled and uncontrolled hypoxic tent systems, and any other products that would infringe the asserted claims of the suit patents.

Obviously, the court cannot grant such an injunction as to the 315, 430, or 535 tents, as to which the court has reversed the jury's verdict on infringement.  With regard to the 150 tent, CAT no longer sells it, and no injunction is necessary.

- 23 -

Damages

CAT also moves for remittitur or a new trial on damages. The jury found that Hypoxico was entitled to a 15% royalty and awarded total damages of $1 million.

If this court's ruling on the 222 and 652 patents becomes final, then it is obvious that the $1 million damages award will need to be drastically revised. The only damages to be awarded would relate to the 150 tent. The court would conduct appropriate proceedings to deal with that issue. If the court's rulings about the patent infringement are reversed on appeal, then it is the view of the court that the damages award of $1 million, while substantially higher than this court would award, is not something which is an unreasonable exercise of the jury's province. Therefore, defendant's motion for remittitur as it is now made is denied.

Hypoxico moves to obtain an accounting with regard to recent sales, as to which evidence was not presented to the jury. There is no occasion for such an accounting at the present time, in view of the court's ruling on infringement with respect to the 315, 430, and 535 tents. As to the 150 tent, the court will not deal with the issue of accounting at the present time.

Motion for Pre- and Post-Judgment Interest

Hypoxico moves for pre- and post-judgment interest. There is no occasion for dealing with these issues at the present time, and the motion is denied.

Conclusion

- 24 -

The court grants CAT's motion for judgment as a matter of law that CAT's 315, 430, and 535 tent systems do not infringe the 222 patent.

The court grants CAT's motion for judgment as a matter of law on the issue of infringement of the 652 patent.

The court denies CAT's alternative motion for a new trial should the Federal Circuit vacate or reverse the amended judgment.

The court denies CAT's motion for remittitur.

The court denies Hypoxico's motion for a permanent injunction.

The court denies Hypoxico's motion for an accounting.

The court denies Hypoxico's motion for pre- and post-judgment interest.

SO ORDERED.

Dated:  New York, New York
       August 28, 2012

Thomas P. Griesa
U.S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/28/12